**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

DHECA, S.R.L.,

            Plaintiff,

v.

LOUIS GOLDBERG,

      Defendant.

Civil No. 1:25-CV-3230

MEMORANDUM OF LAW IN SUPPORT
OF APPLICATION BY PLAINTIFF FOR
AN ORDER TO SHOW CAUSE WITH
TEMPORARY RESTRAINTS TO BE
CONVERTED TO A PRELIMINARY
INJUNCTION AND EXPEDITED
DISCOVERY

<u>Oral Argument Requested</u>

# TABLE OF CONTENTS

FACTS IN SUPPORT OF THE MOTION ................................................................. **2**

    I.   Mr. Goldberg Divests His Membership in HoudiniSwap LLC. ................................. 2

    II.   Ms. Kotliarenko Transfers HoudiniSwap to Mr. Kaczmarek, Who Transfers to DHECA. ........................................................................................................................ 5

    III.  Mr. Goldberg Engages in Cause for Concern and the Parties Disagree About the Transaction. .................................................................................................................. 6

    IV.  DHECA Terminates Mr. Goldberg and Mr. Rogers and Transfers HoudiniSwap's Assets to DHECA. ...................................................................................................... 8

    V.   Mr. Goldberg Lashes Out To Destroy Mr. Kaczmarek and the Company. .................... 8

        A.   Mr. Goldberg Cuts Off Access to Accounts and Drains HoudiniSwap's Money. ..... 9

        B.   Mr. Goldberg Interferes with Contractor One, DHECA's Code, and Cosmos......... 10

        C.   Mr. Goldberg's Lawyers Improperly Interfere With DHECA. ............................... 11

        D.   Mr. Goldberg files a RICO lawsuit and threatens to sell HoudiniSwap. .................. 11

    VI.  Mr. Goldberg's Actions Continue to Harm HoudiniSwap. ......................................... 12

**INJUNCTIVE RELIEF SOUGHT** ........................................................................... **12**

**LEGAL STANDARD FOR INJUNCTIVE RELIEF** ................................................ **13**

**ARGUMENT** ............................................................................................................ **15**

    I.   DHECA Is Likely To Succeed on the Merits of Its Claims Because It Is the Sole Member of HoudiniSwap and Owns All of HoudiniSwap's Former Assets. ...................... 16

        A.   As a Threshold Matter, SVG Corporate Law and HoudiniSwap's Records Reflect That DHECA Is the Sole Member and Owner of HoudiniSwap. .................................... 16

            1.   SVG Law Applies To Disputes About HoudiniSwap's Ownership. ................... 16

            2.   Under SVG Law, DHECA Owns HoudiniSwap. ................................................. 17

        B.   DHECA Is Likely To Succeed on Its Conversion Claim Against Mr. Goldberg. ..... 19

        C.   DHECA Is Likely To Succeed On The Merits of Its Interference With Business Relations Against Mr. Goldberg. ........................................................................................ 21

        D.   DHECA Is Likely To Succeed on Its Trade Secret Claims. ..................................... 23

    II.   DHECA Is and Will Be Irreparably Harmed Without Injunctive Relief. ...................... 26

    III.  The Balance of Equities Cleary Falls in DHECA's Favor. .......................................... 28

    IV.  The Public Interest Factor Also Points in Favor of Relief. ........................................... 29

    V.   DHECA Respectfully Requests Expedited Discovery. ................................................ 30

**CONCLUSION** ........................................................................................................ **30**

## INTRODUCTION

As set forth in the Complaint, Plaintiff, DHECA, S.R.L. ("DHECA"), a Dominican Republic entity, is the sole member of HoudiniSwap LLC ("HoudiniSwap" or the "Company") and holds all of the assets that HoudiniSwap once held, including its code. Plaintiff files this motion seeking injunctive relief because its former owner and member, Mr. Goldberg, has decided that the many corporate documents that he entered into to shield himself from tax authorities and regulators should be ignored and he should instead be able to use HoudiniSwap and its assets how he pleases, notwithstanding longstanding principles of corporate and contract law to the contrary.

As relayed in the pending conflicts motion, Mr. Goldberg's actions have placed HoudiniSwap in regulatory risk and he has removed close to $4 million from HoudiniSwap's operating account. He has blocked HoudiniSwap's sole member from accessing the company's accounts and its key asset. He is actively shopping the Company around for his own benefit, notwithstanding that the Company no longer has any of its assets. He has forced the Company into a strange operational limbo, taking the position that the Company remains in SVG (where it is not in compliance with the new virtual asset laws), and that its paperwork with numerous third parties has been false. DHECA, as the sole member (and thus, owner) of the Company, remains responsible for its actions; Mr. Goldberg's vigilante, self-help efforts to operate the Company as if its hosts of valid corporate records never existed (before any court has invalidated them) threatens irreparable harm not only to DHECA, but also to HoudiniSwap. Accordingly, DHECA respectfully requests that the Court maintain the status quo and issue the preliminary injunction so HoudiniSwap's corporate owner can maintain the Company unless and until Mr. Goldberg is able to show why the corporate records should be ignored.

## FACTS IN SUPPORT OF THE MOTION

**I.    Mr. Goldberg Divests His Membership in HoudiniSwap LLC.**

HoudiniSwap is an online cryptocurrency transfer aggregator platform that connects holders of different cryptocurrencies and allows them to swap tokens at the best possible exchange rate. Mr. Goldberg founded HoudiniSwap in 2023 and registered it as a limited liability company organized in St. Vincent and the Grenadines ("SVG"). *See* Complaint, *Goldberg et. al v. Kaczmarek et. al*, 1:25-cv-02477-JRR (hereinafter, "Goldberg Action"), ECF No. 1 ¶ 2 (D. Md. Jul. 28, 2025); *see also* Ex. R to Sept. 28, 2025 Kaczmarek Decl., **Exhibit 2** hereto. Mr. Kaczmarek met Mr. Goldberg in Mr. Kaczmarek's capacity as the owner of a business called Local Knowledge Network LLC ("LNK"). *See* Sept. 15, 2025 Decl. of Lukas Kaczmarek ¶¶ 3, 8, Goldberg Action ECF No. 31 (hereinafter, "First Kaczmarek Decl.", incorporated hereto). Mr. Kaczmarek entered into a verbal referral agreement with Mr. Goldberg where Mr. Kaczmarek paid him for connecting Mr. Kaczmarek to potential clients or vendors in the cryptocurrency space. *Id.* ¶ 8.

Mr. Goldberg told Mr. Kaczmarek that he no longer wanted to be the owner of HoudiniSwap because, as a Canadian citizen, he did not want to bear regulatory risk of owning a cryptocurrency company, and he perceived a tax advantage under Canadian law if he was not the owner of the Company. *Id.* ¶ 9. Mr. Kaczmarek introduced Ms. Kotliarenko as a possible owner, and Mr. Goldberg agreed that she would be a good fit. Sept. 28, 2025 Kaczmarek Decl. ¶ 3. Mr. Goldberg decided that the risk of transferring the company's ownership to the family member of someone with whom he had a relationship, while still maintaining an operational role in the company through an independent contractor agreement, was more palatable than the risk of maintaining ownership of the cryptocurrency company himself and subjecting himself to tax and regulatory scrutiny, as well as potential third-party litigation.

Several corporate documents were prepared and signed to make clear that Mr. Goldberg intended to transfer ownership of the HoudiniSwap to Ms. Kotliarenko. *See e.g.*, First Kaczmarek Decl. ¶ 10; Ex. C, Goldberg Action, ECF No. 32-4. For example, Mr. Goldberg signed a Transfer and Assignment Agreement, which stated in abundantly plain terms that Mr. Goldberg, as "Transferor[,] hereby . . . sells, transfers, assigns, and conveys to Transferee [Olena Kotliarenko], and Transferee hereby agrees to purchase from Transferor, all of Transferor's rights, title, and interests as Member in the Company." *See* Ex. C, Goldberg Action, ECF No. 32-4. HoudiniSwap's LLC Operating Agreement was also amended, making clear that Mr. Goldberg "shall no longer be a Member of the Company" and that Ms. Kotliarenko was the sole member of the Company. Sept. 28, 2025 Kaczmarek Decl. ¶ 6 & Ex. S (Amendment to Limited Liability Company Agreement). The Amendment also made Ms. Kotliarenko a manager of the Company. *Id.*

Mr. Goldberg entered into an Independent Contractor Agreement with HoudiniSwap. *See* First Kaczmarek Decl. ¶ 10; Sept. 28, 2025 Kaczmarek Decl. ¶ 12 & Ex. W (Signed Independent Contractor Agreement). That agreement governed Mr. Goldberg's relationship with the Company, and is what provided him authority to engage in the Company's affairs. *Id.* Under the terms of Mr. Goldberg's Independent Contract Agreement, Mr. Goldberg was required to do his job in compliance with all applicable laws and regulations. *See* Ex. W. Under that agreement, Mr. Goldberg could be terminated for cause without prior notice, in which case Mr. Goldberg was required to return all of HoudiniSwap's confidential information. *Id.* § 7.

Ms. Kotliarenko, as owner, sole member, manager, and director of HoudiniSwap, entered into numerous legally binding contracts on behalf of HoudiniSwap. First Kaczmarek Decl. ¶ 11. She also used her biometric data list HoudiniSwap's native token $LOCK with cryptocurrency exchange MEXC. *Id.*; *see also* Ex. X to Sept. 28, 2025 Kaczmarek Decl. (Signed MEXC Agreement). Additional corporate documents were executed to make Joshua Rogers a manager—

but not a member—and CEO of the Company. Sept. 28, 2025 Kaczmarek Decl. ¶ 7; Ex. U (Consent to Act as Manager); Ex. V (Second Amendment to Limited Liability Company Agreement).

Ms. Kotliarenko and Mr. Rogers signed several Resolutions on behalf of HoudiniSwap LLC. *See* Ex. T to Sept. 28, 2025 Kaczmarek Decl. The Company confirmed the sale of Mr. Goldberg's membership interest to Ms. Kotliarenko, ratified the transfer agreement, and Ms. Kotliarenko was confirmed to be "the current and only LLC Member" of HoudiniSwap. *Id.*

The entire purpose of Ms. Kotliarenko owning HoudiniSwap was so Mr. Goldberg would not have exposure to tax liability and regulatory risk of owning a cryptocurrency-related company:

---

LW

18:02
Lou Waroo
4) Olena acquired and I ceded control. Olena appointed Josh as CEO to run the company and Josh appointed me as Head of Product. I work at the company but am not in control nor am a shareholder at all. Board meetings are held in Cyprus (where he lives) and I am not even invited to them.
18:02
how about that?

---

*See* Ex. GG to Sept. 28, 2025 Kaczmarek Decl. So, Mr. Goldberg gave up ownership but continued operating the Company as an independent contractor. *See* Ex. W.

In approximately January 2025, HoudiniSwap's registration in SVG lapsed. First Kaczmarek Decl. ¶ 12. At Mr. Goldberg's request, Ms. Kotliarenko executed documentation identifying her as the authorized representative for HoudiniSwap, and the papers bearing her name alone were used to reinstate the Company. *Id.* Mr. Goldberg acknowledged to Mr. Kaczmarek that Ms. Kotliarenko was the sole member of HoudiniSwap and its owner. *See* Sept. 28, 2025 Kaczmarek Decl. ¶ 10.

## II.    Ms. Kotliarenko Transfers HoudiniSwap to Mr. Kaczmarek, Who Transfers to DHECA.

HoudiniSwap received interest for a potential sale of the Company. Around this time, Ms. Kotliarenko did not want to continue to own HoudiniSwap. Sept. 28, 2025 Kaczmarek Decl. ¶ 17. The decision was made to transfer HoudiniSwap from Ms. Kotliarenko to Dominican Republic-based DHECA to make the Company more attractive to the buyer by way of the Company being located in a friendlier regulatory jurisdiction. First Kaczmarek Decl. ¶ 14. Mr. Goldberg asked Mr. Kaczmarek if he would be HoudiniSwap's lawyer, and if not, they would need outside counsel for the transaction. *See* Sept. 28, 2025 Kaczmarek Decl. ¶ 15 & Ex. HH. Mr. Goldberg acknowledged that if Mr. Kaczmarek agreed to be the lawyer for the transaction, he would be paid in return for his legal services. *Id*. Mr. Kaczmarek did not agree to be HoudiniSwap's lawyer. *Id*. Mr. Goldberg then introduced Mr. Kaczmarek to Evan Walman, then a Canadian attorney practicing at the law firm of Segev LLP, as an outside "general counsel" for HoudiniSwap who would assist with the transactions. First Kaczmarek Decl. ¶¶ 14-15 & Ex. A-1, Goldberg Action, 31-1. Mr. Goldberg also told Mr. Kaczmarek that he was consulting with outside tax counsel. *See* Sept. 28, 2025 Kaczmarek Decl. ¶ 16 & Ex. Y.

With the assistance of Mr. Walman, HoudiniSwap was transferred first from Ms. Kotliarenko to Mr. Kaczmarek, then from Mr. Kaczmarek to DHECA. *See* Ex. A-6, Goldberg Action, ECF No. 31-6; Sept. 28, 2025 Kaczmarek Decl. ¶ 11 & Exs. AA (Transfer Agreement from Ms. Kotliarenko to Mr. Kaczmarek), Z (Transfer Agreement from Mr. Kaczmarek to DHECA), BB (Third Amendment to LLC Agreement), CC (Fourth Amendment to LLC Agreement). Mr. Walman provided the template document to memorialize the company's transfer and drafted many of the documents himself. *See* First Kaczmarek Decl. ¶ 14; Exs. A-4 & A-5, Goldberg Action, ECF Nos. 31-4, & 31-5.

Mr. Goldberg was included on these communications and understood that the Company was being transferred to DHECA. *See* Exs. A-6 & A-7 to First Kaczmarek Decl., Goldberg Action, ECF Nos. 31-6 & 31-7. Mr. Goldberg even set up a HoudiniSwap email account for Mr. Kaczmarek "as the sole member of the LLC," and drafted an email to a third-party representing that Mr. Kaczmarek was the owner. *See* Exs. A-2 & A-3, Goldberg Action, ECF Nos. 31-2 & 31-3. The operating agreements make clear that DHECA is the sole member of HoudiniSwap LLC. *See* Ex. CC to Sept. 28, 2025 Kaczmarek Decl. The Fourth Amendment listed that Joshua Rogers and Mr. Kaczmarek would be managers of the Company and that DHECA would be the sole member of the Company, with all rights afforded to members under SVG law. *See id*.

## III.    Mr. Goldberg Engages in Cause for Concern and the Parties Disagree About the Transaction.

Mr. Kaczmarek proposed a cost-savings business solution to Mr. Goldberg regarding the potential sale of HoudiniSwap assets to a third-party buyer. *See* Sept. 28, 2025 Kaczmarek Decl. ¶¶ 17-22. Mr. Goldberg and Mr. Kaczmarek got into a dispute about the cost of the transactions. *Id.* Mr. Goldberg became upset. Mr. Goldberg sent Mr. Kaczmarek transfer documents asking Mr. Kaczmarek to persuade Ms. Kotliarenko to execute a transfer agreement between herself and Joshua Rogers for ownership of HoudiniSwap. First Kaczmarek Decl. ¶ 20. Mr. Goldberg told Mr. Kaczmarek that Joshua Rogers and he had agreed to an incoherent asset loan scheme whereby Ms. Kotliarenko would fraudulently transfer ownership of the company to Mr. Rogers. *See* First Kaczmarek Decl. ¶ 20. When Mr. Kaczmarek told Mr. Goldberg that Ms. Kotliarenko was not going to go along with the scheme, Mr. Goldberg intimated that he was going to move forward with or without Mr. Kaczmarek. Sept. 28, 2025 Kaczmarek Decl. ¶ 25. Mr. Kaczmarek understood this to mean that Mr. Goldberg was going to execute the documents without Ms. Kotliarenko's consent. *Id.*

Against this backdrop, Mr. Kaczmarek noticed several other things that worried him about what Mr. Goldberg might be doing behind the scenes, including the following:

- Mr. Goldberg asked Mr. Kaczmarek to try to persuade Ms. Kotliarenko to open up an account and put a fake address on the KYC form so it would appear that she lived in a different country. First Kaczmarek Decl. ¶ 17; Ex. B-3, Goldberg Action, ECF No. 32-2.

- Mr. Goldberg told Mr. Kaczmarek that he had an "idea" he wanted to float with Mr. Kaczmarek about how Mr. Goldberg could be paid in connection with a future contemplated sale of HoudiniSwap's assets or ownership. That idea amounted to money laundering; that is, Mr. Goldberg's "idea" was to falsely characterize Mr. Goldberg's payment in the contemplated deal as a "business expense." First Kaczmarek Decl. ¶ 18; Ex. B-4, Goldberg Action, ECF No. 32-3.

- Mr. Kaczmarek uncovered that there were millions of dollars of unauthorized, suspicious transactions from the Company's MEXC account by someone using a VPN. First Kaczmarek Decl. ¶ 21.

- Mr. Kaczmarek noticed that Mr. Goldberg had been amassing in a cryptocurrency wallet that served as one of HoudiniSwap's Treasury accounts close to $4 million that looked like a "slush" or "getaway" fund. The wallet had only received tokens since November 2024 (when the first letter of intent for the sale of HoudiniSwap was received and countersigned by Ms. Kotliarenko). First Kaczmarek Decl. ¶ 21 & Ex. H, Goldberg Action, ECF No. 32-7

This, along with other information that Mr. Goldberg had shared with Mr. Kaczmarek, (including that Mr. Goldberg had been involved with a defendant in a recently indicted federal fraud scheme, *see* Sept. 28, 2025 Kaczmarek Decl. ¶ 26), made him extremely uncomfortable and worried about Mr. Goldberg's conduct and its effects on the Company (for which DHECA was responsible). Mr. Kaczmarek called Mr. Goldberg who started screaming at him; Mr. Kaczmarek made clear that he wanted the $3.9 million put into an escrow account. Mr. Kaczmarek and Mr. Vargas confronted Mr. Goldberg about their concerns via email, but received no response. *See* Sept. 28, 2025 Kaczmarek Decl. ¶¶ 29-30. Around this time, Mr. Kaczmarek noticed that DHECA's Member access to HoudiniSwap's company email accounts was being obstructed and that certain communications with staff members were being blocked. *Id.* at ¶ 31.

## IV.    DHECA Terminates Mr. Goldberg and Mr. Rogers and Transfers HoudiniSwap's Assets to DHECA.

At the end of May, DHECA sent notice to Mr. Goldberg, Mr. Rogers, and HoudiniSwap's contractors, among others, that Mr. Goldberg's and Mr. Rogers' independent contractor agreements and positions within the Company were terminated. Ex. DD to Sept. 28, 2025 Kaczmarek Decl. (DHECA HS Member Directive Email). The email also made clear that John Reusing had been selected as the interim CEO to coordinate a full audit of the Company, instructed that Mr. Reusing be provided all confidential had authorization to coordinate said audit, and directed that Mr. Reusing be provided all access to HoudiniSwap's systems to coordinate the audit, including access to HoudiniSwap's source code. *Id.*

While this was happening, SVG had announced that the provisions of the Virtual Asset Business Act were to go into effect. *See* Ex. N to Solano Decl., Goldberg Action, ECF No. 33-4 (FSA Notice); Ex. M to Solano Decl. (Virtual Asset Business Act), Goldberg Action, ECF No. 33-3. The new law put several regulatory requirements on HoudiniSwap. Under this new framework, penalties for noncompliance include hefty fines and imprisonment. *See* Ex. M § 19 to Solano Decl., Goldberg Action, ECF No. 33-3; *see also* Ex. O §§ 105-06 & sched. to Solano Decl., Goldberg Action, ECF No. 33-5 (Limited Liability Companies Act, Ch. 151) (hereinafter "SVG LLCA").

To avoid a potential regulatory nightmare, DHECA, which was a Dominican Republic based company, transferred HoudiniSwap's assets to DHECA itself, rendering HoudiniSwap LLC a shell company. First Kaczmarek Decl. ¶ 27. That asset transfer agreement is governed by Dominican Republic law and was properly recorded in the corporate registry of the Dominican Republic. *See* First Kaczmarek Decl. ¶ 27 & Ex. L., Goldberg Action, ECF No. 33-1.

## V.    Mr. Goldberg Lashes Out To Destroy Mr. Kaczmarek and the Company.

Following his termination, Mr. Goldberg did not seek the assistance of the Courts to purportedly "right" a wrong perpetrated against him. He and his lawyers needed time to figure out

a creative approach to try to invalidate all of the corporate documents that he intentionally signed when he thought they benefited him.

In the meantime, Mr. Goldberg set out to destroy Mr. Kaczmarek. *First*, Mr. Goldberg shut out DHECA's and Mr. Reusing's access to HoudiniSwap's accounts and corporate records so an audit could not reveal the full nature of how he had been using the Company and drained the Company's operating account. *Second*, Mr. Goldberg went to HoudiniSwap's key vendor who created and maintained HoudiniSwap's valuable source code—"Contractor One"—and lied and defamed Mr. Kaczmarek to Contractor One, told Contractor One to ignore the legally binding documents reflecting DHECA's ownership of the code and convinced Contractor One to require *all correspondence with DHECA to include Martin Weinstein at Cadwalader*. *Third*, Mr. Goldberg deployed lawyers to improperly threaten Mr. Kaczmarek's and Ms. Kotliarenko's livelihoods. And when that did not work, Mr. Goldberg filed, purportedly on behalf of HoudiniSwap, a salacious RICO lawsuit attempting to discredit DHECA and Mr. Kaczmarek and baiting Ms. Kotliarenko's deportation.

### A. Mr. Goldberg Cuts Off Access to Accounts and Drains HoudiniSwap's Money.

DHECA was cut out from HoudiniSwap's email accounts and records. *See* First Kaczmarek Decl. ¶ 24. Mr. Reusing was not permitted to conduct an audit of the Company and has not been allowed to access DHECA's source code. Sept. 28, 2025 Kaczmarek Decl. ¶ 39.

After his independent contractor agreement was terminated, Mr. Goldberg did not return HoudiniSwap's confidential information to the Company. Instead, he maintains access to and control over HoudiniSwap's finances, (including the Treasury wallet), *see* Compl. ¶ 109, Goldberg Action, ECF No. 1, and began draining HoudiniSwap's Treasury cryptocurrency wallet, with the wallet's balance going from approximately $3.9 million to its more recent balance of approximately $73. First Kaczmarek Decl. ¶¶ 25-26 & Exs. I, J, K, Goldberg Action, ECF Nos.

32-8, 32-9, & 33. Nearly all remaining fund equivalents in an amount not less than $976,000.00 were withdrawn on September 2, 2025, leaving only the equivalent of $73.00 by September 13, 2025. First Kaczmarek Decl. ¶ 26 & Ex. K, Goldberg Action, ECF No. 33.

### B. Mr. Goldberg Interferes with Contractor One, DHECA's Code, and Cosmos.

Mr. Goldberg has engaged in self-help to try to interfere with HoudiniSwap's most valuable asset, its code. Contractor One created and currently maintains the source code for the software underlying HoudiniSwap. *See* Sept. 28, 2025 Kaczmarek Decl. ¶¶ 4-5. Contractor One is under a strict confidentiality agreement with HoudiniSwap that is intended to protect the code as a trade secret. *Id.* The code is not only necessary to HoudiniSwap's business, but arguably *is* HoudiniSwap's business. *Id.*

As mentioned above, all of HoudiniSwap's assets, including its code, were transferred from the HoudiniSwap LLC to DHECA. First Kaczmarek Decl. ¶ 27 & Ex. L, Goldberg Action, ECF No. 33-1. Mr. Vargas reached out to notify Contractor One of the ownership transfer to DHECA and suggested that Contractor One sign a new confidentiality agreement with DHECA as the signatory. Sept. 28, 2025 Kaczmarek Decl. ¶ 39 & Ex. EE.

It appears that Mr. Goldberg had a call with Contractor One, during which Contractor One was falsely told that a criminal complaint had been filed against Mr. Kaczmarek in the United States,  Mr. Goldberg falsely stated that he was the owner of HoudiniSwap, and Mr. Goldberg directed Contractor One not to interact with Mr. Kaczmarek. *Id.* Mr. Goldberg and Mr. Rogers further instructed Contractor One (i) not to sign any document with DHECA and (ii) to fully disclose the content of his discussions with Martin Weinstein. Following Mr. Goldberg's interference, Contractor One has state that any further communications on DHECA's behalf would need to be conducted via email, with Martin Weinstein copied. *Id.* Mr. Goldberg's actions have

impeded DHECA's relationship with Contractor One and have blocked DHECA's access to its most valuable asset. *Id.*

It appears that Mr. Goldberg has similarly interfered with HoudiniSwap's registered agent in SVG, Cosmos. Cosmos has claimed that they had not received ownership records of the Company, notwithstanding Mr. Walman's assurances that he was updating the registry. *See* Sept. 28, 2025 Kaczmarek Decl. ¶¶ 35-37 & Ex. FF.

### C.      Mr. Goldberg's Lawyers Improperly Interfere With DHECA.

Mr. Goldberg has used his lawyers to try to unwind his decisions without involving the Court. For example, Martin Weinstein of Cadwalader spoke with an attorney in the Dominican Republic who represents DHECA. Sept. 28, 2025 Kaczmarek Decl. ¶ 39. The call began with typical pleasantries, but then devolved. *Id.* Mr. Weinstein threatened that his firm employed the former Attorney General of Maryland (presumably, Douglas Gansler who has appeared in this case), who was personally going to file a bar complaint with the Board of Professional Responsibility against Mr. Kaczmarek if DHECA did not abandon its ownership of HoudiniSwap. *Id.* Apparently amused, Mr. Weinstein made a veiled threat about a lawsuit harming Ms. Kotliarenko's immigration status in the United States, stating that he did not know how a lawsuit would work out for her given her green-card status. *Id.*

### D.      Mr. Goldberg files a RICO lawsuit and threatens to sell HoudiniSwap.

On July 28, 2025, Mr. Goldberg filed his threatened lawsuit claiming, among other things, he was "duped" by Mr. Kaczmarek and so all of the corporate transaction documents (including those prepared with outside counsel) should not count, and HoudiniSwap LLC should be considered his company. *See* Compl., Goldberg Action, ECF No. 1. The Complaint gratuitously alleges Ms. Kotliarenko's green-card status and brings a bogus claim of legal malpractice, notwithstanding that Mr. Goldberg has retained and paid several law firms in the past, but has no

engagement letter and has not paid Mr. Kaczmarek a dime for their conversations. *Id.* ¶¶ 10, 50, 188-92. On September 4, 2025, Mr. Goldberg moved for an expedited hearing, arguing that it was necessary given an impending sale of the Company. DHECA's counsel has asked Mr. Goldberg's counsel on several occasions if they would agree not to try to sell the Company or the assets pending resolution of this dispute, but they have refused. Any "sale" of HoudiniSwap or the code by Mr. Goldberg would be invalid and risks further complicated protracted litigation to undo.

## VI.    Mr. Goldberg's Actions Continue to Harm HoudiniSwap.

At present, Mr. Goldberg has blocked the Company from being able to be audited, has pilfered close to $4 million of the Company's money, has blocked access to DHECA's value asset (the code), and is spending significant resources having his personal attorneys purport to bring claims on behalf of a Company on theories that threaten the validity of its contracts and place it in a potentially noncompliant regulatory state. Mr. Goldberg's position exposes HoudiniSwap to the very Canadian tax liabilities he was trying to avoid.

Further, there is a significant risk, especially in light of HoudiniSwap being represented by Mr. Goldberg's conflicted lawyers, that Mr. Goldberg will do something that is in his own interest but harms the Company. Mr. Goldberg's recent filing suggests that notwithstanding the problems with unauthorized transfers from the MEXC account, a lack of an audit, and the company's records reflecting ownership in different jurisdictions, rather than address these issues Mr. Goldberg has purportedly found someone and wants to sell the Company to profit himself.

## INJUNCTIVE RELIEF SOUGHT

A temporary restraining order ("TRO") and preliminary injunction are necessary to stop Mr. Goldberg from continuing to ruin the Company and DHECA's valuable assets. There must be immediate preliminary relief implementing safeguards to maintain a status quo and stop Mr. Goldberg's vigilante self-help measures while the litigation proceeds. And that status quo—which

adheres to the Company's indisputable corporate documents—should be maintained unless and until Mr. Goldberg can somehow prove that his "I didn't really mean it so let's undo it all" suggestion has any support in the law. Simply put, a disgruntled and terminated independent contractor cannot steal a company, unilaterally declare that the company's corporate papers are invalid, and then devastate the company while litigation is pending. The law does not condone self-help, nor does it ignore the validity of a company's duly executed contracts and corporate records. Accordingly, Plaintiff seeks the following—first as a TRO until an evidentiary hearing can be held and then as a preliminary injunction:

1. An order restricting Mr. Goldberg (and his lawyers and other agents) from representing that he owns HoudiniSwap LLC or any of the assets that were formally held by HoudiniSwap LLC, including the code maintained by Contractor One, and restricting them from interfering with any of DHECA's business relationships (including with Contractor One);

2. An order dismissing HoudiniSwap LLC as a Plaintiff from Mr. Goldberg's lawsuit because no authorized representative of the Company has authorized it to be a Plaintiff in U.S. federal court;

3. An order restricting the attempted transfer, sale, or dissolution of HoudiniSwap LLC and the transfer, copying, destruction, or sale or any of its formerly owned assets, including any revenue that HoudiniSwap generates during the pendency of these proceedings;

4. An order requiring Mr. Goldberg to provide DHECA with access to HoudiniSwap's electronic accounts and corporate records and to cease interfering with such access or with DHECA's ability to conduct an immediate audit; and

5. An order requiring the return of—and, in turn, preventing Mr. Goldberg from interfering with DHECA's access to—the nearly $3.9 million in cryptocurrency owned by HoudiniSwap, along with any other of its digital assets.

These measures are necessary to maintain the status quo and permit the Company to continue to operate under the terms of its corporate records while this litigation is pending.

## LEGAL STANDARD FOR INJUNCTIVE RELIEF

"The purpose of a TRO is to 'preserve the status quo only until a preliminary injunction hearing can be held.'" *ClearOne Advantage, LLC v. Kersen,* 710 F. Supp. 3d 425, 431 (D. Md. 2024)

13

(quoting *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d 411, 422 (4th Cir. 1999)). Moreover, "[t]he standards for granting a TRO and granting a preliminary injunction are the same." *Id.* To obtain either form of injunctive relief, the plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell,* 915 F.3d 197, 211 (4th Cir. 2019). "The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held and to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *Fed. Trade Comm'n v. Pukke*, 795 F. App'x 184, 188 (4th Cir. 2020) (internal citation omitted). Because a preliminary injunctive relief is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Where the harm is irreparable, like the threat of criminal prosecution and or misappropriation of trade secrets, injunctive relief is warranted. *See ClearOne*, 710 F. Supp. 3d at 436 ("[C]ourts frequently grant injunctions when there is a substantial risk that the defendants will continue to divulge or misappropriate trade secrets in the absence of court action."); *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 396 (D. Md. 2022) (granting injunctive relief and noting that "[q]uantifying damages resulting from a criminal prosecution would be nearly impossible").

Where immediate and irreparable harm will result if defendants are not restrained prior to a preliminary injunction hearing, the Court may impose a TRO, immediately granting plaintiff's requested relief without holding a full evidentiary hearing for the record (and in some cases without even providing notice to the opposing party). *See ClearOne*, 710 F. Supp. 3d at 431 ("A court may enter a TRO without full notice, even, under certain circumstances, ex parte." (internal quotations omitted)). The TRO will then preserve a status quo until the court can hold an evidentiary hearing to

determine whether to convert the TRO into a preliminary injunction that then preserves the status quo indefinitely until the litigation concludes. *See Hoechst Diafoil*, 174 F.3d at 422 ("While a preliminary injunction preserves the status quo pending a final trial on the merits, a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held[.]").

Courts also have discretion to issue "mandatory preliminary injunctions," meaning those that "alter the status quo." *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 223 (4th Cir. 2025). In the Fourth Circuit, "[w]e have defined the status quo for this purpose to be the last uncontested status between the parties which preceded the controversy." *Id.* (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014)). When a preliminary injunction is properly classified as "mandatory," the court must determine that "the applicant's right to relief is indisputably clear." *Am. Fed'n of Teachers v. Dep't of Educ.*, 779 F. Supp. 3d 584, 604 (D. Md. 2025). However, that analysis is unneeded if the injunction is not properly classified as "mandatory"—*i.e.*, if the injunction requires conduct that merely restores the last uncontested status between the parties. *See Real Time Med. Sys., Inc.*, 131 F.4th at 223; *PSEG Renewable Transmission LLC v. Arentz Family, LP*, 2025 WL 1919947, at *2 (D. Md. July 11, 2025) ("The preliminary injunction this Court has granted simply confirms [Plaintiff]'s preexisting legal entitlement to conduct the studies at issue; the status quo has been preserved, not altered. But even if framed as a modification of the status quo such that it constitutes mandatory preliminary injunctive relief, [Plaintiff] has satisfied that standard." (cleaned up)).

## ARGUMENT

The Complaint alleges six causes of action: a declaratory judgment, a request to inspect the books and records of the Company, along with four counts for which Plaintiff seeks a TRO and preliminary injunction: (i) conversion; (ii) tortious interference with business relations; (iii) misappropriation of trade secrets under state and federal law. As articulated below, DHECA is

likely to succeed on the merits of these claims, and, more importantly, is at risk of suffering immediate and irreparable harm if injunctive relief is not granted.

**I.      DHECA Is Likely To Succeed on the Merits of Its Claims Because It Is the Sole Member of HoudiniSwap and Owns All of HoudiniSwap's Former Assets.**

To establish a likelihood of success on the merits, Plaintiff must "make a clear showing that [it is] likely to succeed at trial," but "need not establish a 'certainty of success.'" *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020)); *see also Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.,* 131 F.4th 205, 224 (4th Cir. 2025); *ICENY USA, LLC v. M & M's, LLC*, 421 F. Supp. 3d 204, 215 (D. Md. 2019) ("[M]oving parties must clearly demonstrate that they will likely succeed on the merits.") (internal quotation omitted). Plaintiff meets those standards.

**A.      As a Threshold Matter, SVG Corporate Law and HoudiniSwap's Records Reflect That DHECA Is the Sole Member and Owner of HoudiniSwap.**

**1.      SVG Law Applies To Disputes About HoudiniSwap's Ownership.**

In Maryland, ownership disputes of foreign companies are governed by "laws of the state under which a foreign limited liability company is organized." Md. Code, Corps. & Ass'ns § 4A-1001; *see also Yao v. Chen*, 2025 WL 317517, at *7 (D. Md. Jan. 27, 2025) ("[T]he internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs" such that "[t]he law of the state of incorporation . . . governs questions relating to the rights and responsibilities of such entities and individuals arising from the corporate relationship."). Furthermore, "if the contract at issue contains a choice of law provision, the law of the specified jurisdiction is generally applied." *Abbella Group Healthtech, LLC v. Qualivis, LLC*, 2025 WL 2430018, at *5 (D. Md. Aug. 22, 2025).

Under those standard, SVG law applies to the questions involving HoudiniSwap's

ownership, control, access, and corporate books and records. HoudiniSwap is registered in SVG. *See* Ex. R. Consistent with that registration, HoudiniSwap's operating agreement and the amendments thereto contain a choice-of-law clause selecting SVG law. *See* Exs. R, S, V, BB, CC. Additionally, the documents memorializing Mr. Goldberg's transfer of his membership interest to Ms. Kotliarenko and his Independent Contract Agreement state that they are to be governed by SVG law. *See* Ex. W § 8.3. Simply put, HoudiniSwap is an SVG entity that was created in SVG under SVG law, and its governing contracts (*e.g.*, operating agreement, transfers of the LLC's ownership) explicitly choose SVG law. SVG law should apply to disputes over HoudiniSwap's ownership.

### 2.    Under SVG Law, DHECA Owns HoudiniSwap.

Under SVG's Limited Liability Companies Act, a person who acquires an LLC interest becomes a member:

> (a) in the case of a person acquiring a LLC interest directly from the LLC, when the person's admission appears in the records of the LLC upon compliance with the LLC agreement or, if the LLC agreement does not so provide, upon the consent of all members; and
>
> (b) in the case of an assignee of a LLC interest, when the person's admission appears on the records of the LLC upon compliance with the LLC agreement or, if the LLC agreement does not so provide, as provided in Part VIII.

SVG LLCA § 34(2). There is no requirement that a member make a contribution to become a member. *Id*. § 34(3) ("A person may be admitted to a LLC as a member of it and may receive an interest without making a contribution or being obligated to make a contribution to the LLC."). Once a member assigns her interest, that assigning member loses all rights (*i.e.*, ownership interests and control). *Id.* § 60(3) ("Unless otherwise provided in a LLC agreement, a member ceases to be a member and to have the power to exercise any rights or powers of a member upon assignment of his interest as a member.").

Here, the corporate records, which are indisputable, confirm that:

- Mr. Goldberg was the sole member upon formation of HoudiniSwap LLC (*see* Ex. R);

- He then transferred and assigned the entirety of that membership interest to Ms. Kotliarenko (*see* Exs. C, S, T, W) (and he reaped the tax benefit of doing so);

- In connection with that transfer and assignment, Mr. Goldberg resigned as a member and manager of HoudiniSwap (*see* Ex. C) and became an independent contractor (*see* Ex. R), whereas Ms. Kotliarenko became HoudiniSwap's sole member and manager (*see* Exs. C, S, T);

- Ms. Kotliarenko—with the knowledge and assistance of Mr. Goldberg and his counsel—subsequently transferred and assigned the entirety of that membership interest to Mr. Kaczmarek (*see* Ex. AA);

- Mr. Kaczmarek—with the knowledge of assistance of Mr. Goldberg and Mr. Goldberg's counsel—subsequently transferred and assigned the entirety of that membership interest to DHECA (*see* Ex. Z);

- DHECA is the sole member of HoudiniSwap, the only entity who can authorize a derivative lawsuit on its behalf, and owns all of the assets that HoudiniSwap used to own (*see* Exs. L, AA, CC); *see also* SVG LLCA § 88.

Under SVG law (and under basic contractual principles), therefore, DHECA became and remains the sole owner of HoudiniSwap. The documents were clear. *See* Ex. S ("Olena Kotliarenko [is] the sole Member of the Company," and "Louis M. Goldberg shall no longer be a Member of the Company."). And when the Company's registration lapsed, Ms. Kotliarenko signed the records that restored the Company's status. First Kaczmarek Decl. ¶ 12.

Throughout those corporate activities, moreover, Mr. Goldberg repeatedly communicated in writing with Mr. Kaczmarek and with outside counsel, Evan Walman:

- Mr. Goldberg acknowledged that Mr. Kaczmarek was "the sole member of the LLC" and drafted language for an email, to a third-party purchaser, from "Luke Kaczmarek, Owner of Houdiniswap LLC";

- The three exchanged drafts of the requisite contracts to transfer ownership of HoudiniSwap to Mr. Kaczmarek and then to DHECA; and

- Mr. Walman stated that "I'm cleaning up records today Luke – we want to be able to go to the agent to update the registers and get a fresh COI by end of the week" and "[c]an you finalize the transfer docs between Olena and

18

yourself today or tm and provide to me so I can file accordingly?"

Exs. A-3 through A-6, Goldberg Action, ECF Nos. 31-3-31-6. Once the transfer was complete, moreover, Mr. Goldberg sent a meme calling Mr. Kaczmarek "O Captain My Captain"—another acknowledgment that Mr. Goldberg knew of and facilitated the transfer of HoudiniSwap to Mr. Kaczmarek and then DHECA. *Id.* In sum, all corporate records and communications show that DHECA is the sole member of HoudiniSwap and sole owner of HoudiniSwap's assets. That evidence also confirms that Mr. Goldberg became an independent contractor, before being terminated for engaging in illicit activities that wrongfully exposed HoudiniSwap's actual owner to potential liability.[1] None of the records and communications indicate that Mr. Goldberg is a member of HoudiniSwap. Thus, Mr. Goldberg's claim of ownership must fail.[2]

### B.    DHECA Is Likely To Succeed on Its Conversion Claim Against Mr. Goldberg.

"Under Maryland law, conversion involves any distinct act of dominion or control exerted by one person over the personal property of another in denial of his right or inconsistent with it."

---

[1] The delegation of day-to-day managerial responsibilities and control to Mr. Goldberg does not indicate that he held any membership or ownership interest. Under SVG law, members can delegate those responsibilities to people who are not members. *See* SVG LLCA § 47. When a member delegates management or control, moreover, the member does **not** somehow lose their ownership, right to control, or right to terminate the delegation, nor does the delegate somehow obtain ownership or the ability to override the member's authority:

> Unless otherwise provided in the LLC agreement, a delegation by a member or manager of a LLC shall not cause the member or manager to cease to be a member or manager, as the case may be, of the LLC or cause the person to whom any such rights and powers have been delegated to be a member or manager, as the case may be, of the LLC.

*Id.* Consequently, Mr. Goldberg's management of HoudiniSwap under the Independent Contractor Agreement—*i.e.*, pursuant to authority contractually delegated to him by HoudiniSwap's member—is not evidence that Mr. Goldberg was a member or owner. Rather, that delegation of management responsibilities to Mr. Goldberg is further evidence that he was no longer a member/owner.

[2] The claim of ownership also fails under Maryland law. *See Furrer v. Siegel & Rouhana, LLC,* 2022 WL 9834101, at *9 (Md. Ct. Spec. App. Oct. 17, 2022) ("The owners of an LLC are known as 'members.' Individuals can become members of an LLC only in the manner specified in the operating agreement or in [CA] § 4A-601." (cleaned up)); Md. Code Ann., Corps. & Ass'ns § 4A-601 ("After the formation of a limited liability company, a person may be admitted as a member . . . [i]n the case of a person acquiring a membership interest directly from the limited liability company, upon compliance with the operating agreement or, if the operating agreement does not so provide, upon the unanimous consent of the members[.]"); *see also First Union Nat. Bank v. Steele Software Sys. Corp.*, 838 A.2d 404, 447 (Md. Ct. Spec. App. 2003) (Maryland courts employ the "law of objective interpretation, [which] means that the clear and unambiguous language of a written agreement controls, even when the language is not consistent with the parties' actual intent at the time of the creation of the contract.") (internal citations omitted).

*Great Am. Ins. Co. v. Nextday Network Hardware Corp.*, 73 F. Supp. 3d 636, 640 (D. Md. 2014) (internal quotations omitted). "Conversion requires a physical act combined with a certain state of mind." *Aronow v. Retina First LLC*, 748 F. Supp. 3d 354, 364–65 (D. Md. 2024) (internal citation omitted). "The physical act can be summarized as any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Id.* (cleaned up). "The act of ownership can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits." *De Simone v. VSL Pharm., Inc*., 133 F. Supp. 3d 776, 796 (D. Md. 2015).

"The defendant may have the requisite intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property." *Potts v. Maryland Games, LLC*, 2019 WL 4750339, at *3 (D. Md. Sept. 27, 2019) (noting that "[c]onversion may occur in a variety of circumstances"). Notably, conversion applies to both tangible and electronic property. *See Thompson v. UBS Fin. Servs., Inc.*, 443 Md. 47, 59, 115 A.3d 125, 132 (2015) ("[F]or conversion's purposes, there is no distinction between hard copy and electronic data" (internal quotations omitted)).

The evidence establishes those elements. First, even though DHECA is the legal, rightful owner, Mr. Goldberg has exercised dominion and control over HoudiniSwap, as well as and assets formerly owned by HoudiniSwap. He admits to maintaining control over HoudiniSwap's cryptocurrency wallets and now over $3.9 million worth of crypto assets is gone. He has excluded—and continues to exclude—Mr. Kaczmarek and DHECA from accessing HoudiniSwap's accounts (which DHECA owns) to conduct an audit. And he has similarly prevented DHECA from accessing the source code. Through that conduct, Mr. Goldberg is exercising dominion and control over DHECA's cryptocurrency wallets, not less than $3.9 million worth of cryptoassets, financial accounts, and source code—even though DHECA is the rightful

20

and legal owner of each of those assets. *See also* SVG LLCA Ch. 151 § 38 (noting that unless the LLC agreement provides otherwise, the manager of an LLC may not keep confidential from the members any information, trade secrets, or other information of the LLC). In other words, Mr. Goldberg is denying, and acting inconsistently with, DHECA's rights as the owner of those assets.

Second, the evidence shows that Mr. Goldberg intended to exercise that control. He continues to retain access to the cryptocurrency wallets, cryptocurrency, financial accounts, and source code, while he also continues to prevent DHECA from any access to that property. There is no inadvertence or mistake; Mr. Goldberg is purposefully exercising dominion over that property, despite lacking any documentary basis for claiming ownership or refuting DHECA's ownership.

Thus, DHECA has a likelihood of success of the merits of this claim. Consequently, the evidence justifies a preliminary injunction ceasing Defendant's ongoing conversion of DHECA's property. *See, e.g.*, *De Simone*, 133 F. Supp. 3d at 796 (granting preliminary injunction where "[Plaintiff] has shown a likelihood of success on the merits of its claim that [Defendant] has improperly retained corporate records").

### C.    DHECA Is Likely To Succeed On The Merits of Its Interference With Business Relations Against Mr. Goldberg.

Mr. Goldberg, both directly and through his attorneys acting at his direction, has tortiously interfered with the contract between HoudiniSwap (as owned and controlled by DHECA) and Contractor One. Under Maryland law, the elements of tortious interference with contract are: "(1) the existence of a contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional interference with that contract; (4) hindrance to the performance of the contract; and (5) resulting damages to the plaintiff." *ClearOne Advantage, LLC v. Kersen*, 756 F. Supp. 3d 30, 44 (D. Md. 2024).

The evidence establishes each element. First, Contractor One has a contract with

HoudiniSwap (a fully owned subsidiary of DHECA). *See* Ex. Q to Sept. 28, 2025 Kaczmarek Decl. (Contractor One Agreement). Under that contract, Contractor One is contractually obligated to "make itself available for consultation with [HoudiniSwap]" and "prepare and submit to [HoudiniSwap] such periodic reports regarding the performance of the Services, as [HoudiniSwap] may from time to time require." *Id.* § 3.5. Contractor One is further obligated to "upon [HoudiniSwap]'s written request, [] promptly 5 Business Days after such [] request: (a) deliver to [HoudiniSwap] all tangible documents and materials (and any copies) containing, reflecting, incorporating or based on [HoudiniSwap]'s Confidential Information," *id.* § 8.3, and is prohibited from disclosing any confidential information, in the intellectual property of Houdini Swap, to any third parties, including former contractors like Mr. Goldberg, *id.* § 9.2. The agreement specifically notes that HoudiniSwap would be "irreparably harmed by a breach" of the confidentiality provisions, and that HoudiniSwap would be "entitled to seek injunctive or other equitable relief to prevent a breach [] and to secure the enforcement of this Agreement." *Id.* § 9.6.

Second, it is indisputable that Mr. Goldberg knew of that contract. He has never claimed otherwise, and as stated above, he communicated with Contractor One in order to stop their performance under that contract vis a vis DHECA's ownership of HoudiniSwap.

Third, Mr. Goldberg interfered with that contract by inducing Contractor One to breach. Mr. Goldberg—whose independent contractor position with the Company had been terminated by the time he spoke with Contractor One —had no right to contact Contractor One, let alone claim ownership over HoudiniSwap. Nonetheless, he contacted Contractor One, lied about HoudiniSwap's ownership, spread falsehoods about Mr. Kaczmarek, and instructed Contractor One not to comply with its contractual obligations to HoudiniSwap. His actions have led to Contractor One refusing to speak with DHECA without the inclusion of Cadwalader—a third-party without contractual or legal authority to represent or bind HoudiniSwap—on all

correspondence. Because of Mr. Goldberg's communications, Contractor One has breached its contractual obligations to HoudiniSwap, including by, upon information and belief, sharing HoudiniSwap's propriety confidential information with someone who no longer has a relationship with the Company: Mr. Goldberg. *See* Ex. Q.

Finally, those actions were calculated to, and did, cause significant damage to HoudiniSwap and, in turn, to its owner, DHECA. HoudiniSwap's value has been greatly diminished by the inability to access its primary asset: the source code. If the source code is not properly turned over to DHECA, then HoudiniSwap—a company that, without unlawful interference, is worth millions of dollars—is essentially worthless.

In sum, Plaintiff has shown a likelihood of success on the merits of its tortious interference claim. Thus, Plaintiff is entitled to a preliminary injunction on that claim as well. *See, e.g.*, *Hyperheal Hyperbarics, Inc. v. Shapiro*, 2018 WL 4257331, at *8 (D. Md. Sept. 6, 2018) (issuing preliminary injunction involving tortious interference claim).

### D.    DHECA Is Likely To Succeed on Its Trade Secret Claims.

"To establish misappropriation of a trade secret under federal law and Maryland state law, [the plaintiff] must demonstrate that the documents at issue are trade secrets, and that Defendants misappropriated those trade secrets." *ClearOne*, 756 F. Supp. 3d at 41. More specifically, [t]he DTSA allows an owner of a trade secret that is misappropriated to bring a civil action if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 141 (4th Cir. 2023) (citing 18 U.S.C. § 1836(b)(1)) (cleaned up). "To prevail on such a claim, a plaintiff must accordingly establish (1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." *Id.* Trade secrets are protected under both federal and Maryland law, *see* 18 U.S.C. §§ 1836, 1839; Md. Code Com. Law § 11-1201, and the

"definitions of [trade secret and] misappropriation in federal and state law [] mirror each other." *ClearOne*, 756 F. Supp. at 42. The evidence establishes each element.

A "trade secret" includes "all forms and types of financial, business, scientific, technical, economic, or engineering information, including . . . codes," that "the owner thereof has taken reasonable measures to keep [] secret," and which "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3); *Philips N. Am. LLC v. Hayes*, 2020 WL 5407796, at *8 (D. Md. Sept. 9, 2020) ("The DTSA and the MUTSA define a trade secret in substantially the same manner." (internal quotations omitted)). Applying that definition, courts have repeatedly found that software codes were trade secrets. *See dmarcian*, 60 F.4th at 141 (noting that "source code" is "likely [a] trade secret" because "if other [] companies knew the source code, they could reverse engineer [plaintiff's] software and entice customers with a competing product"); *Phreesia, Inc. v. Certify Glob., Inc.*, 2022 WL 911207, at *12 (D. Md. Mar. 29, 2022) (finding that a company's software code was a trade secret); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 663 (4th Cir. 1993) ("The source code can and does qualify as a trade secret.").

The source code falls squarely within that definition. As the propriety code underlying a bespoke cryptocurrency company (HoudiniSwap), the source code is technical information that derives independent economic value by virtue of its secrecy. The implementation of that code facilitates the trade of cryptocurrency in cross-border transactions and, therefore, touches interstate and foreign commerce.[3] Any sale, copying, or disclosure of the code would result in a copycat company that would directly compete with HoudiniSwap for business. Furthermore, HoudiniSwap

---

[3]  The DTSA applies to conduct outside of the United States so long as "an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837(2); *see also dmarcian*, 60 F.4th at 142. As discussed *infra*, Mr. Goldberg has misappropriated DHECA's trade secret through his U.S. counsel, Cadwalader.

(through its agents) has taken significant care to ensure that the proprietary source code remains confidential. *See e.g.*, Ex. Q § 9 (prohibiting the disclosure of HoudiniSwap's proprietary code and defining the violation thereof as a material breach warranting injunctive relief). *See Phreesia*, 2022 WL 911207, at *12 (noting that requiring confidentiality agreements, using remote servers, and controlling access to the code was sufficient to establish that owner intended to keep the information secret).

The source code has been misappropriated. "A trade secret is misappropriated if it was acquired: (1) by a person who knows that the trade secret was acquired by improper means, or (2) by a person who uses or discloses the trade secret after acquiring it through improper means." *Philips*, 2020 WL 5407796, at *10 (citing 18 U.S.C. § 1839(5)(A), (5)(B)(i); C.L. § 11-1201(c)). When a former employee takes or retains ownership over a trade secret after his employment (such that his legal access to the trade secret has been terminated), courts regularly find that misappropriation has occurred. *See Philips*, 2020 WL 5407796, at *10 (defendant "accessed, downloaded, and printed [plaintiff's] confidential documents after accepting a job offer with [a competitor] without any business justification for doing so, . . . [and] failed to return these documents to [plaintiff] upon the termination of his employment"); *Bond v. PolyCycle, Inc.*, 732 A.2d 970, 977 (Md. Ct. Spec. App. 1999) (employee did not have "authority to abscond with [plaintiff's] trade secret and use it for his own benefit after he resigned"). Notably, a plaintiff does not need to demonstrate that defendant used the trade secret improperly; rather, "*acquisition* alone is enough." *Philips*, 2020 WL 5407796, at *10 (emphasis in original).

The evidence establishes misappropriation. After his independent contractor agreement was terminated, Mr. Goldberg was required to return all confidential information to the Company. He had no further right or entitlement to HoudiniSwap's assets, including its code. And that is certainly true after HoudiniSwap transferred the code to DHECA. Nonetheless, he contacted

Contractor One, lied about the legal status of HoudiniSwap's ownership, falsely claimed ownership, and obtained (through Contractor One) access and control over the code. And now, he is trying to sell it. Nothing more is required to show misappropriation. Thus, a preliminary injunction is warranted.

## II.    DHECA Is and Will Be Irreparably Harmed Without Injunctive Relief.

"To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley*, 915 F.3d 197 at 216 (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). Harm that is "irreparable . . . cannot be fully rectified by the final judgment after trial." *Id.* Irreparable harm can take many forms, including "the loss of goodwill in the relevant industry, loss of customers, and loss of the ability to attract new customers," *ClearOne*, 710 F. Supp. 3d at 436, the inability to "control[ one's] own intellectual property in furtherance of operating [the] business," *Hyperheal Hyperbarics, Inc.*, 2018 WL 4257331, at *9, and criminal prosecution—a harm so great that "quantifying [its] damages [] would be nearly impossible." *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 396 (D. Md. 2022). While financial harm is not typically grounds for a preliminary injunction, it is warranted if a "temporary delay in recovery" could result in "permanent injury[, for example] threatening a party's very existence by [] driving it out of business before litigation concludes." *Mountain Valley Pipeline*, 915 F.3d at 218; *accord Omaha Property Manager, LLC v. Mustafa*, 2025 WL 744049, at *6, *16 (D. Md. Mar. 7, 2025) (granting permanent injunction barring defendants from falsely claiming ownership of disputed property and marketing it for sale).

Without injunctive relief, DHECA will suffer many forms of irreparable harm. *See* Sept. 28, 2025 Kaczmarek Decl. ¶¶ 40-50 (describing irreparable harm). As outlined in Mr. Kaczmarek's pending motion to disqualify Cadwalader, Mr. Goldberg is taking legal positions that suit him but

threaten to harm the company. Mr. Goldberg's litigation antics threaten the reputation of HoudiniSwap and the reputation of DHECA. *Id.* ¶¶ 48-50. Mr. Goldberg's interference with DHECA's registered agent in SVG to prevent HoudiniSwap's records from properly reflecting that the Company has been transferred to DHECA in the Dominican Republic puts Mr. Kaczmarek and Mr. Vargas, as Managing Partners of DHECA and owner of HoudiniSwap, at risk of SVG regulatory noncompliance. Though legally liable for the Company, neither Mr. Kaczmarek nor Mr. Vargas are able to control its operation in SVG due to Mr. Goldberg's interference. The harm stemming from unwarranted criminal prosecution, including emotional and physical harm, loss of dignity, and damage to reputation, nearly defines "irreparable." *See Ass'n of Am. Publishers,* 586 F. Supp. 3d at 396 ("Quantifying damages resulting from a criminal prosecution would be nearly impossible.").

Mr. Goldberg's interference with Contractor One and conversion of HoudiniSwap's code prevents DHECA from controlling its own intellectual property and impedes HoudiniSwap's ability to function. So long as Mr. Goldberg maintains access to the code, there is a risk that he may use it to create a competing platform to undermine the financial viability of HoudiniSwap. Furthermore, DHECA intends to use the source code as a baseline for other unrelated, non-competitive projects with several major partners; these joint ventures are on indefinite hold as a result of this dispute, and the opportunity to move forward dwindles with time.

And most immediately, Mr. Goldberg's attempt to sell HoudiniSwap, despite its contested ownership and his lack of authority to bind the Company, will cause irreparable harm. To be clear, HoudiniSwap does not have legal title to any assets; they have been transferred to DHECA. Any "sale" would potentially put HoudiniSwap in a position where it could be sued for undisclosed liabilities and a likely inflated value of its assets. Such a sale would violate a number of different contracts, including HoudiniSwap's own operating agreement, require enormous amount of contentious litigation to unravel before the courts, and incur millions of dollars in attorneys' fees.

Mr. Goldberg's ongoing conversion of HoudiniSwap's cryptocurrency threatens the financial security of the business and its regulatory risk. Additionally, Mr. Goldberg's sensational rumors about Mr. Kaczmarek and the public ownership dispute, threaten the Company's reputation. As such, injunctive relief is necessary to prevent such irreparable harm.

Mr. Goldberg's conversion of HoudiniSwap's code and interference with Contractor One also requires immediate intervention. Federal courts routinely grant TROs when, as here, a misappropriation of intellectual property has occurred. *See ICENY USA, LLC v. M & M's, LLC*, 421 F. Supp. 3d 204, 223 (D. Md. 2019); *Hyperheal Hyperbarics, Inc.,* 2018 WL 4257331, at *1. There is nothing to stop Mr. Goldberg from running away with HoudiniSwap's code and starting a competing company with the same source code or selling it to the highest bidder for his own profit. The source code *is HoudiniSwap's business*, and preventing DHECA from taking full and proper ownership is akin to having a new owner purchase a pasta restaurant only to have the previous owner run off with the recipe to the secret sauce. *ClearOne Advantage*, 710 F. Supp. 3d at 436 ("[C]ourts frequently grant injunctions when there is a substantial risk that the defendants will continue to divulge or misappropriate trade secrets in the absence of court action."). If Mr. Goldberg is not immediately instructed to return HoudiniSwap's code to its proper owner, then the Company is essentially worthless. *See e.g. Mountain Valley Pipeline*, 915 F.3d at 218.

## III.    The Balance of Equities Cleary Falls in DHECA's Favor.

When weighing the balance of equities on a request for injunctive relief, the court compares the harm to the plaintiff if relief is wrongly denied against the harm to the defendant if relief is wrongly granted. *ClearOne*, 710 F. Supp. 3d at 437. The court may also consider the strength of the movant's likelihood of success—*i.e.*, when the relative hardships appear similar, the probability of success assumes significance. *Id*. Courts give little weight to a defendant's claimed burden when an injunction merely enforces contractual obligations that the defendant already

accepted; such harm is minimal and largely self-inflicted. *Id.* at 437–38 (citing *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 785 (4th Cir. 2011)). At the same time, harms to the plaintiff such as loss of goodwill, misappropriation of trade secrets, and loss of customers weigh heavily in favor of injunctive relief because they are difficult to quantify and often irreparable. *id.* at 436–37 (citing *Signature Flight*, 442 F. App'x at 785).

As discussed above, DHECA faces precisely these irreparable harms, including reputational damage, misuse of company infrastructure, and erosion of trust among current and prospective customers and vendors. As noted, Mr. Goldberg has stolen the Company, depriving DHECA of control over its intellectual property and impairing the platform's operations. He also has diverted money from operating accounts, jeopardizing key relationships. And he has publicized the dispute, sowing uncertainty among users. *See ClearOne*, 710 F. Supp. 3d at 436–37. Conversely, Mr. Goldberg can show little cognizable hardship from the Court enforcing contracts to which he agreed with the benefit of outside lawyers.

## IV.    The Public Interest Factor Also Points in Favor of Relief.

The public interest is served by preventing unfair business practices and enforcing valid contracts. *See, e.g., Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 142 (D. Md. 2020) (public interest favored injunction to protect trade secrets and prevent unfair practices); *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 642 (D. Md. 1998) (public interest favors enforcing reasonable restrictive covenants that protect goodwill); *NaturaLawn of Am., Inc. v. W. Grp., LLC*, 484 F. Supp. 2d 392, 404 (D. Md. 2007) ("It is in the public interest to repudiate [attempts to avoid contractual obligations] and enforce valid contracts."); *see also ClearOne*, 710 F. Supp. 3d at 438 (finding public interest supported TRO where defendants profited from misappropriated confidential data). In particular, "the public interest favors the protection of trade secrets," which by "prevent[ing] unethical business behavior [that risks] driving another competitor out of business

29

[] unfairly." *Brightview*, 441 F. Supp. 3d at 142. Here, Without immediate injunctive relief, Defendants will continue to exploit misappropriated company source code and profits to DHECA's detriment. It best serves the public interest to preserve the status quo and allow the ownership dispute to be resolved on the merits, rather than blessing Mr. Goldberg's self-help.

## V.     DHECA Respectfully Requests Expedited Discovery.

Plaintiff respectfully requests that the Court permit limited expedited discovery. Where a preliminary injunction is pending and the discovery requests are reasonably tailored to the substance of that injunction, expedited discovery is routinely granted. *See Courthouse News Serv. v. Harris*, 2022 WL 3577255, at *6 (D. Md. Aug. 18, 2022) (noting that expedited discovery is warranted if it is "a necessary aspect of plaintiff's presentation at the Preliminary Injunction hearing") (internal quotations omitted); *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*, 2022 WL 326473, at *10 (D. Md. Feb. 3, 2022) (discovery is "particularly appropriate" when "preliminary injunction" sought).

Plaintiff seeks limited expedited discovery consisting of: (1) limited Requests for Production; (2) two party depositions; and (3) a handful of subpoenas for discrete documents and testimony from third-party witnesses. *See* **Exhibit 1** (Proposed Expedited Discovery for DHECA). The requested limited discovery is narrowly tailored to the grounds of this preliminary injunction, will reflect the irreparable harm to Plaintiff, and will bolster the likelihood of success on the merits. The discovery will debunk the false narrative that Mr. Goldberg was "confused" or "misled" by contracts and transactions that transferred his ownership of HoudiniSwap. The discovery will also demonstrate that Mr. Goldberg has interfered with Plaintiff's ownership of HoudiniSwap and its former assets.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court order immediate injunctive relief as a TRO, set a preliminary injunction hearing on a date in January or early February 2026, and grant the request for limited, expedited discovery.

Dated: September 29, 2025

Respectfully submitted,

**SILVERMAN, THOMPSON, SLUTKIN, WHITE**

*s/ William N. Sinclair*
William N. Sinclair (MD #28833)
400 E. Pratt St., Suite 900
Baltimore, MD 21202
(410) 385-2225
(410) 547-2432
bsinclair@silvermanthompson.com

**DYNAMIS LLP**

*s/ Jamie Hoxie Solano*
Eric Rosen, Esq. (admitted *Pro Hac Vice*)
Jamie Hoxie Solano, Esq. (admitted *Pro Hac Vice*)
11 Park Place
New York, New York 10007
ERosen@dynamisllp.com
JSolano@dynamisllp.com

*Attorneys for Plaintiff DHECA*